I have three appeals to hear this morning. Everyone should rest assured that we're familiar with your case, we've read your briefs, the authority cited in your briefs, at least portions of the record. We probably have some questions, but in the limited time that's available to you, you should feel free to get straight to the heart of your argument. Again, please do not treat the red light as aspirational. If you're answering a question from the court when the red light shines, feel free to finish your answer, but do respect the court's time. Our first case this morning is Hall v. Alabama. Mr. Brasher, General Brasher. Judge Pryor, may it please the court. Let me start with a mootness issue in the case. So it's our position that this case was mooted in 2013 when the election took place and Mr. Hall was not on the ballot. Now, usually an election law dispute like this would be capable of repetition and evading review, but this is a very unusual election law dispute because Mr. Hall is not challenging a policy that applies to all elections. He's not even challenging a policy that applies to all special elections in the same way. Instead, he has brought a very narrow as-applied challenge to what happened in 2013. He's brought a challenge to the 3% signature requirement as it applied to a U.S. House special election on the timeframe with 106 days to collect signatures. And it's his burden to show a reasonable expectation or a substantial likelihood, demonstrated probability rather, that this will reoccur as to him in such that there's a real case for controversy between the state and him that continues. And it's our position that he hasn't met that burden. What about the regulatory change that has occurred? Right. So that's an additional mootness problem in the case. And if you look at the district court's opinion on page 5, 7, 9, 51, the district court was pretty clear that the regulation that was in place in 2013 that made Mr. Hall identify the date of the election on his signature petition was one of the key problems in the case. Also, if you look at Mr. Hall's affidavit. Those numbers again of the page numbers of the district court opinion. The district court's opinion at page 5, 7, and 51, I think that's the clearest where the district court viewed that as a problem. Also, if you look at Mr. Hall's affidavit in the case and Mr. Moser's affidavit, who is also a plaintiff. I'm looking at 51 and it says whether it was 56 or 106 days, which is what the way I read the district court opinion that his opinion, it seemed to me, was addressed to either 56 or 106. He didn't really decide which was operative. And therefore, he was saying, in effect, it seemed to me, that even if he had 106 days, it was unconstitutional. And it seems to me that the change in the regulation is very significant with respect to 56 days, but not with respect to the 106. What do you think about that? Let me address that briefly. So he had 106 days because he had to call the Secretary of State's office and get a special dispensation from them because of that preexisting regulation. But for that regulation, he would have had, I believe it's 126 days. So he would not have had to get that special dispensation. And he would have already known as soon as there was an inkling that there would be a special election, that he could have started gathering signatures. And so my point about citing those pages was that— That might be not a big difference between the 126 or it might have been 124. I'm not sure. Right. And 106. But whether it's a big difference or not, it's a different case, isn't it? I think it is a different case because now, Mr. Hall, if he had the idea that there was going to be a special election, he could go ahead and start gathering signatures for that right now. And what we're looking at, too—I mean, this case has so many mootness problems, right? This is one of the—one mootness problem. But, I mean, what we're looking at here is a district court opinion that is really as applied to the facts of a 2013 election that took place and to these unique facts of Mr. Hall having to call the Secretary of State's office and try to get this dispensation. It really is limited to what happened in 2013. And this House district, the last time there was a special election for this House district was 70 years ago. So if you were to sort of speculate that there's going to be another one within 70 years, that would be long after any of us are tired of hearing about this case. Yes. I was born in 36 and I'm 81. It's 80 years ago. Okay. So it's—my point being is that it's really just speculation that there's even going to be one of these. So Judge Anderson is also better at math than you, General Brasher. That is unsurprising. That is unsurprising. There's a reason I had to go to law school. Let me direct you back to the regulation for a minute. As I understand it, had the new regulation been in place at the time, Mr. Hall would have had 18 additional days to collect signatures, but he would not have had any additional time to organize or plan his signature drive. Is that correct? Well, I think that is correct in some sense but incorrect in other sense. And so the way in which I think it's incorrect, which I think is the most significant, is that he has time to plan his signature drive. He would not have had a pre-advanced notice of when the congressman was going to resign. I mean, he wouldn't have known that the congressman was going to resign. But even now, I mean, what we're looking at, especially when we're looking at this cable of repetition yet evading review exception to the mootness doctrine, is what the Supreme Court has said is not that there's just some exception to Article III case for controversy, but that under certain circumstances, the law is having a real world impact today on what someone is doing and what they're planning to do. In the usual case where there's an election dispute like this, the person who's suing wants to plan their next political campaign, right? They're sitting with their advisors and they want to plan their next political campaign. They're talking to people. They're evaluating whether they can make that. And the law is having a real world impact on how they can do that today. But that's not the case here. I mean, Mr. Hall is not sitting around planning to run in the next potential special election. And so to go to your point, he would have been in a better position had this regulation have changed. If he thinks that the cable of repetition yet evading review doctrine applies in this case, he would have been in a better position to plan for the next special election. But you're right. Factually, he would not have known that the congressman was going to resign. And there is testimony in this record, as I understand it, about how difficult it is to collect signatures before the date when the special election is announced, right? That's right. That's right. I mean, we don't disagree that running in a special election is hard. But our point is that it's hard for the Republican candidates. It's hard for the Democratic candidates. These are not burdens that the state imposes. This is just the nature of the schedule. And ultimately, I think the argument in this case comes down to the idea that the law always has to change for a special election, that whatever might be constitutional for the purposes of a regularly scheduled election is not for a special election. That's not something that any court has held. Let me ask you this question. Why isn't there a reasonable expectation that the controversy will occur again with respect to Hall in his capacity as a voter as opposed to a candidate? Because this only applies with respect – the controversy here, rather, is only with respect to a House district special election. And the only House district in which he can vote in is House District 1. And there's just no reasonable expectation or demonstrated probability that there's going to be another special election in that House district within the next few years. And aside from all of that, his complaint about the 106 – is it 106? 106 days. 106 days and the 56 days, which is the premise of the injunction, right, no longer applies in the light of the new administrative regulation. Isn't that right? That is right. I mean the facts cannot occur again because of that regulation. Isn't that right? That's right. But let me also point out something else. I mean there actually is no injunction here. This is just a declaratory judgment. And one of the ways I think – I mean in our brief we point out one thing that emphasizes the moodness of this is that the district court really couldn't craft an injunction because there's no remedy to give Mr. Hall. There's nothing real in the world that you can give him that would satisfy him because the election has already taken place and there is no reason to think that there's going to be another one that would fit these same facts. It does seem to me that what we have is maybe these precise facts will not recur, and I don't think they will. But we do know that the rationale of this opinion, if it were the law of this circuit, would probably repeat because these special elections are always going to be on a truncated schedule like this. If not these particular days, something very close to that. In a situation like that, and I'm asking because I don't know, I didn't think of this until right now, is the case moot when it is very likely to recur on facts similar but not likely to occur on these precise facts? Right. So I think the answer to your question is that this court has actually held that to meet this exception to the moodness doctrine it has to be that the plaintiff in this case, the facts are likely to recur to the plaintiff in this case. So had this case been moot? Well, assume for purposes of this question that we adopt this rule in the 5th, 6th, 7th, and 8th, I believe, that the same complaining party rule does not apply in election cases. So assume that. Right. So if you were to get rid of that rule, then I think you could probably, I suppose you could evaluate this as to whether some third party who was not in front of you would be affected. But I still think you wouldn't be able to look at the circuit in general. And then my question, it's not going to be affected probably by these precise facts, not 106 or 124 days, but it's going to be something like 124 days because a special election, you'll always want it to be truncated. You'll always want the constituents to not be unrepresented for long. Right. And we don't disagree that those are… Do you have a case that talks about moodness in that situation where the rationale will recur but not the precise facts? No, I don't have a case like that. And I say, I mean, this moodness issue here is a unique issue. But I would say, I mean, this Court has, I think, held that it has to be the same complaining party. And this isn't a political party in front of you. This isn't a public interest group. I mean, this is one candidate who wanted to either vote for or be on the ballot. Nor was a class certified. No class was certified. And so, you know, the district court here, I think it was expressed that he was worried about third parties and issuing some kind of advisory decision, really, that would assist third parties. And that's just not something that you can do under the context of this case. That doesn't meet Article III standards. If I could make one, well, I see the red light is on. I'm going to be asking a lot of questions on the merits to the other parties. But you can have time. Yeah. Why don't, in fairness, though, to the other party, in responding, we give them two minutes. Okay. All right. To address the merits. Okay. Well, let me move quickly then to the merits. So, you know, in our view, this case is obviously controlled by Swanson, the previous case from this court that held constitutional Alabama's 3% signature requirement as applied to regularly scheduled elections. And there's only one difference between Swanson and this case, and that's the timing that was allowed. But that timing really shouldn't be significant. And I just want to just go through and identify the sort of the way our statute stacks up with other cases. So here, Mr. Hall had 106 days to collect around 5,900 signatures. That works out to about 56 signatures per day. In Genes, the Supreme Court upheld a ballot access law that required 117 signatures per day. In Libertarian Party, this court upheld a ballot access law that required 67 signatures per day. Now, those were regularly scheduled election cases. But I want to point out two special election cases, the only real special election cases that have been cited. In the Montana case, Breck, which was cited by my friend on the other side, the court actually held Montana's law to be unconstitutional and imposed a remedy there. The remedy that the court imposed in the Montana case was 400 signatures over five days, which works out to 80 signatures a day. So the remedy that was imposed in the Montana case is less restrictive than Alabama's law in this case. In the Jones case, another special election case, that's from the Illinois District Court, the remedy that was imposed there was 3,444 signatures over 62 days, which works out to 55 signatures a day. Once again, comparable to what Alabama was requiring of Mr. Hall in this case. Hall would not have been on the ballot in any of these systems that were held to be constitutional or in the special election cases were actually the remedies that the courts imposed in light of the finding that that law there was unconstitutional. He collected 26 signatures a day. And at 26 signatures a day, he would have needed 288 days to meet our requirement. And I want to make just one more point, I guess, about the merits, which is that this was an election to represent 600,000 people in Congress. This was not sort of a small task. But all that Mr. Hall was able to come up with was he and his wife, as a team, trying to collect signatures door to door. And that's just not a realistic effort to run for Congress. Thank you, Your Honor. Let me ask him one question. I didn't catch it when you divided 62 days into 3,444 signatures. What did that come out to? That comes out to about 55 a day. But I respectfully request that you check my math on that. All right. All right. All right. General Brasher, you've saved four minutes for rebuttal. Mr. Schoen. May it please the Court. I couldn't disagree, I suppose, more on virtually every issue that was discussed. Let me start out with the issue that the Court directed us to address today, if I might. Just a couple of housekeeping issues with respect to that. Of course, the Court asks whether, based on the change in the regulation, the injunction be lifted. Of course, there is no injunction in this case. It's a declaratory relief case, which the Supreme Court has suggested might well make a difference. I'd refer the Court to the Brockington case. It's an old case from the Supreme Court, 1969 case, in which the law was changed from a 7 percent that was being challenged to 4 percent while the case was on appeal. And the Court eventually held it to be moot, but said had they asked for a declaratory judgment, it would not have been moot. And that said – That has to be dictum. Yes, Your Honor. It's 396 U.S. 41 at page 42. Judge, the second thing is, of course, the change here didn't happen while the case was on appeal. The change in the regulation here happened a year and a half before the district court's opinion was issued. What I can't figure out is why the district court, though, would have included in its final judgment, the 5B provision about the date of the special election being announced less than 57 days prior to the petition deadline. Why would that at all be significant in the light of the new administrative regulation? Because, Your Honor, the Court was reciting the history of what happened, and that was one of the factors that was a burden in this case. But respectfully, Your Honor – I mean, as a historical matter, what had happened is moot. I mean, if the complaint is about the 2013 election, then that really is moot because it's already occurred. The question is, is it still moot? And you would agree, would you not, it has to be the mootness determination is for your client, not for anybody else. He's the only voter who's a plaintiff, right? He's the only voter who's a plaintiff, Your Honor, yes. So it has to be not moot as to him, right? That's right, Your Honor. All right, and so the question then is, going forward for future elections, is it moot? And I don't understand the materiality of the 57 days and the like going forward. Okay, Your Honor, I'll address that. And Judge – other Judge Pryor raised the question that suggested the answer to this. We're way off track, with all due respect to whoever raised this issue. We're way off track on focusing on this regulation. I raised this issue. I can see, Your Honor. Here's the reason. This is a challenge to – I understand the court raised the issue, but I think it's a fundamental misreading of the opinion, Your Honor, with all due respect. This is a challenge to the statute, the 3 percent signature requirement as applied to a special election on a truncated schedule, period. This regulation is one factor that added to the burden in this case. And let me – so let me get – What's the point, though, of the 57 days? I'll get there, Your Honor. The 57 days – Judge Thompson addresses this in his opinion. I'll give you the page numbers to the published opinion. What Judge Thompson said is this is one factor, the fact that you have to put your – the date of the election on the ballot. But it's not the only factor. How can it be a factor at all in the light of the new regulation? Because, Your Honor, exactly what Judge Thompson found, until the date of the special election is known, the party suffers all kinds of burdens. There's no voter interest until the date is there. There's no – they lose all the ramp-up time. A candidate can't even determine whether it would be viable for him or her to run as an independent until they know when that election is going to be set. It's got nothing to do with – or little to do with the mechanics of this ballot petition. And the idea that the – he waited these two weeks since the vacancy was announced simply to get a special dispensation on the ballot so that the date didn't have to be there is simply not accurate. The fact of the matter is the Secretary of State always puts sample ballots on its website for a general election. It didn't have any sample ballots up for this special election. There are emails in the – How does that have to do with getting a petition? That's – he had to get his petition approved by the Secretary of State's office because he didn't have a model to go by. They will throw out these petitions in a second if all of the details aren't there. So – And after the new regulation they will? Absolutely, Your Honor. This only changed one thing. Where's the evidence in the record of that? The new regulation only changed one thing. The new regulation – No, no, no. So you say the Secretary of State will throw out the petition, right? Why? If what's required in the regulation is not on the ballot, it sets out the specific requirements. And what's – now in the light of the new regulation, what's required that will get thrown out? Any technical defect. For example, Your Honor – I didn't think that this was a challenge to any technical defect. It's not a challenge to the regulation at all, Your Honor. The regulation is irrelevant. Let me make that point, if I may, Your Honor, based on the record and based on Judge Thompson's opinion. From the start of this case, the Secretary has taken the position that the regulation is absolutely irrelevant to this case, number one. Number two, the Secretary waived this provision of the regulation from the start. Therefore, it could not have been effective. Look, look, look, look. I mean, you know, my concern is a mootness concern, and as you well know, that can't be waived. That's subject matter jurisdiction. Mootness can't be waived. The Secretary waived – my point is this regulation didn't apply in this case. So the repeal of it has absolutely no effect on this case. The regulation simply didn't apply. I'm going to refer the Court to the record. 23-1 tab, the Packard Affidavit. They gave him – they did not apply the date. 23.1 Packard Letter. This is a Secretary of State letter of 9-25-13. 23-2, Jean Brown's Affidavit. She instructed them to go forward. Don't worry about the date on the – putting the date on the petition. In their answer, document 38, paragraph 24. That's what happened as to the past election, right? The election is at issue here. All of the – no, this election is not at issue here. 2013. Past election then, Your Honor, if that's what we're going with. Yeah, but that's my problem, okay? We're not evaluating that. We're evaluating how this – right? Sure, Your Honor, and it's not effective. That truly is moot. And this does not remove the burden that Judge Thompson found applies. Again, the regulation in this case wasn't applied. That's why he had 106 days. And the – Counsel. It can't be a material fact, Judge. The repeal of it can't be a material fact if it didn't have any impact on this case. And it didn't. The burden exists. But do you agree that the challenge of this law as it pertains to the election that already occurred is moot? No, I agree that with respect to injunctive relief, it's moot. With respect to a declaratory judgment, it is not moot. How can that be? For an election that has already occurred. How is that not a purely advisory opinion? To the extent that you have an election that has occurred before the court rules, if the court says that the application of this law to the election that has already occurred is unconstitutional, how is that anything but an advisory opinion? What the court said is any special election in which the vacancy is not announced at least 124 days ahead of time and the date of the election is not announced at least 57 days ahead of time, to require this 3% signature to apply the statute to a special election like that is unconstitutional. And by the way, the idea that that's what it declared, and that applies to any person in a special election, that's the capable of repetition yet evading review issue that two judges below passed on twice. Judge Fuller and Judge Thompson considered that question carefully. But Judge, if I may, let me go to the opinion. I think you've agreed with me that as to the 2013 election, it's moot. You're just saying that that factual circumstance going forward. It has no bearing on whether the case is moot. It has no bearing whatsoever on whether the case is moot. That's the standard election law and capable of repetition yet evading review. Judge, if I might just go to the opinion. Judge Thompson made clear that the burden in this case, well beyond and not subject to this regulation, was severe because the election date hadn't been announced yet, having nothing to do with the mechanics of the opinion. Again, this is now the published opinion. Why don't we get to the merits? Why don't we get to the merits? I think this is an important point, Judge. I mean, on the mootness question, you're the judge, so you're going to tell me what's important. But I think these— Give us the page number that you're talking about. Page number 1164. Judge, court found, of course, time is not unlimited. Page 1166. He couldn't begin collecting signatures until the vacancy was announced, first of all, and this gives no preparation time. You have to have time to raise funds, organize campaigns, recruit and train campaign staff, volunteer and pay signatures, and there's no meaningful time to prepare. And before the date of the election is given— that's why he has that second paragraph about the 57 days— before the date of the election is announced, there's low voter interest, so it's a much greater burden to collect signatures, voter apathy. These are findings based on the record. This is all in the record. We had an expert testimony in the case, three affidavits from an expert this court has recognized. I don't know about my sister, but I agree with my brother that you ought to get to the merits. Yes, Your Honor. Okay. I focused all my time, frankly, on the—I've never had the court direct us to address a question like that, so I focused a great deal of argument— Let me go ahead and give you straight up. I'm worried about the signatures per day. It seems to me that the Supreme Court in Stora at page 1284 and the Supreme Court in American Party of Texas— and I can't remember the page number there— but both of them have talked about signatures per day. And not only that, but they assume that it's reasonable to require so many signatures a day, 14 per day per canvasser in Stora and four per day per canvasser in American Party. And either one of those, this plaintiff could have done by gathering, I figured, five canvassers to meet the Stora test and 17 to meet the American Party test. So how do you answer that? The overriding answer is what the court suggests, quite frankly, is nothing other than a litmus test. And this court and every other court that's considered it, starting with Anderson, starting with Stora, rather, and going through Anderson, has said we cannot engraft some number on a fact-specific inquiry. Why would it be different? When you're talking—I understand it'd be different. And frankly, I understand there's a different startup problem, and we've got a startup problem. And incidentally, my figures of five, recruiting five canvassers or 17, that assumes that he had a full month to prepare. And I only counted 90 days that he had to actually raise. So he had 18 days before the 106 started, and then he had—I just rounded down to 90 days, that's 16 more, that's 34 days, which I figured might take care of the problem of startup. He's got a whole month to raise money to recruit his volunteers. And then he still—all he's got to do is recruit five volunteers to meet the Stora standard or 17 to meet the American Party standard. And it seems reasonable to me that he should be able to do that if he's got a modicum of support. Your Honor, I appreciate—unfortunately, though, for that perspective, we have a record in the case. And that's not what the record suggests. The record is filled with what exactly the burden was. There are two answers to the court's question. Why is this different from those? Because, number one, special elections are different. They are unique animals for all of the reasons set out in the evidence below. Number two, Green Party of Georgia, the 2016 opinion in this case, kicked the case back because the court below used exactly this kind of reasoning. Well, if it was good enough in Genes or good enough in American Party, then it should have been good enough here. Let me say this, Judge. In Genes, a candidate actually got on the ballot in 1966 and 1968. The United States Supreme Court has never approved a system of ballot access in which a candidate through that system, an independent candidate, has never gotten on the ballot. We presented in the record below voluminous bits of evidence, detailed evidence, on the number of special elections for House seats in Alabama, the number of votes in those seats, et cetera, and not one candidate ever was able to get on because of the stringent ballot access regulations. No such system has ever been approved. We were asked at the court, had anyone tried? And so we gave a detailed list of all 18 of them on each occasion. That's sort of the— I've got another question about your winger affidavit and that no independent candidate has ever gotten on the ballot in a special election for the House seat in Alabama. I wonder how significant that is when up until 1971, the requirement for number of signatures was only 300, and therefore it seems to me something else and not the signature requirement was keeping people off of the ballot or even wanting to go on the ballot, probably because they had people like Howell Heflin running and he'd been there for years, you know. How do you account for that? Every one, 14 of the 16 of these special elections you're talking about, occurred before 1971 when all they had to do was get 300 signatures. Well, respectfully, the signature requirement is varied. I sort of lay out in there the history of the number of signature requirement. From 1903 or 1908, I forget, until 1971, it was 300 signatures. I don't know the precise answer to each case as to why the person didn't get on. I also don't think, quite frankly, Judge, that's our burden. Is there really any evidence in the record that in that time period, independent candidates sought and failed to gain access? Yes, Your Honor, it's right in the record, all of that. That was a question Judge Thompson asked. And so after that hearing, we produced a document that showed the entire history of the candidates who tried, who vacated the office, why it happened. And, of course, the reason these things regularly occur is because it can occur from a death, a resignation, et cetera. You know, there's a recent case from Utah, 2007. Tell me what's in the record, though, about these candidates who tried to run as independents. What's in the record is the date of the special election. Right. What led to the vacancy, somebody's death or resignation, who the candidate was who ran, and then what happened, that the person didn't get on. How many signatures they got, how many – I can pull that record. It's in the part of the appendix also. So they got less than 300? I don't know the answer to that off the top of my head, Your Honor. Again, you will find it in the record, certainly, and I'd be happy to follow up and point the court to it in the record. Let me ask you one more question. It seems to me that there might be a difference between ordering a candidate to collect 400 signatures over five days for a special election versus keeping up that same pace over 100-plus days. Is there anything in the record in this case that would suggest that, you know, the more days you have, to keep up that pace of signatures would be a lot more difficult? Of course, Your Honor. And that's why Judge Thompson in this court, in Swanson, drew one of the primary factors is that there's an unlimited period of time. This partially answers that, and I'll get back to it. That there's an unlimited period of time to gather the signatures. Here, again, until the date of the election was announced, that time was meaningless. Why? Because the evidence unrebutted in the record is that there's no voter interest at that point. It's very difficult to get people even to comply. By the way, we have in the record an affidavit of someone who dropped out because it was too onerous a task to try to raise those number of signatures on this kind of truncated time frame. But, yes, the burden evidence is in the record in a couple of Hall affidavits on how he tried at various times to get people to go along. He didn't have the money to hire a lot of people. This guy was a United States Marine Corps member. He said he applied his work ethic. He got out there every day. Judge Thompson found he was a diligent candidate. I mean, I don't think at this stage it's for us. Let me ask you a question. So General Brasher says that this declaratory judgment only pertains to a special election for a House seat in this, I guess, in this district. Is that true? Because I read, I mean, I've read Judge Thompson's judgment, and it says that it's declared that the enforcement of the 3 percent signature requirement as set forth in the code is unconstitutional during any off-season special election for which. And then it has the vacancy being announced less than 24 days and the special election being set 57 days. This was very specifically addressed in the record below. Judge Thompson asked us, what relief are you seeking? And that's how he was going to make the order in the case one way or the other. We have a submission that's in the appendix also, in the supplemental appendix, that said it applies only, the question was, first of all, it applied to Senate and House. The question was, the answer was, we are challenging its application in any U.S. House of Representatives race in a special election in Alabama, period. And that's what the order applies to. That's the relief that was requested. So that would then apply to any House district in Alabama? Any House district in Alabama in a special election. Even though your client can only live in one of those House districts? There's no requirement that he live in the district that he runs in, Your Honor. But he can't run in all of them. He can't run in all of them, no, but he can run in any one at any given time. He could live in Mobile and run in Birmingham? Yes, Your Honor. Okay. We addressed that in the record also, in the brief. How am I to know from Judge Thompson's declaratory judgment that that is limited to a House election? I think he could have been more precise in saying that, but if you look at the record, you see what relief was requested. And we have a discussion. There's a hearing before Judge Thompson and then a follow-up submission. Let me say this, Judge, if I can. I just have to return to this mootness point because I really have a great deal of difficulty with it. Beyond the fact that the regulation isn't even material because there's all of this other burden, that's why we needed the election date to be announced more than 56 days, 57 days. That's otherwise. This case is not Flanagan. Flanagan, Troiano, Judge Anderson, you wrote the opinion. The whole Court's familiar with it. Those cases are where the underlying ordinance, the thing being challenged, has been repealed or amended, et cetera. Besides all of the reason Flanagan doesn't apply, there's a whole line of cases from this Court that has said when, first of all, you know, by the way, Your Honor wrote, Judge Pryor wrote in 2015, as long as parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot. In general, a case becomes moot only when it is impossible for a court to grant any effectual relief, whatever, to the prevailing party. That's Cook v. Bennett, 2015. Right. The problem that lied— First, we have a declaratory judgment here, right? The reason we— We don't have an injunction here. Correct, Your Honor. That's exactly right. That's what's an important distinction. And if the election is—if the vacancy is announced, I guess, 125 days before this special election, this declaratory judgment doesn't apply. It would not violate this order. And that's why, Your Honor, I put in the record— I don't know how you violate a declaratory judgment. I mean, it's not an injunction. That's right, Your Honor. But it would be—it would not be declared unconstitutional. It wouldn't be declared unconstitutional. And by the way, Your Honor, when we said before, are these facts able to repeat themselves? Among the many factors in this case was a concession by the Secretary of State multiple times that the timeframe in this case was uniquely long. And the statistics bear all of that out. So if it occurs again, and it will, somebody is going to die in office, God forbid, somebody is going to resign from office, it will. According to the record in this case, that timeframe will be shorter. Go ahead. One more question on the merits. You haven't answered to my satisfaction why what the Supreme Court said in Stora and American Party and what we said in Libertarian is not relevant. I realize we have at least one unpublished opinion almost saying that it was irrelevant. And you can rely on it. And I understand why a presidential race is different from a congressional race or a local race. But when you are talking about how many signatures per day a canvasser should reasonably be required, Alabama can reasonably expect that a diligent candidate could raise 14 signatures per day or four signatures per day. I don't understand how that is different from this case or any case that's going to arise in the future. Judge, I can only refer the court to what the experts said, what the evidence is in this case, why special elections are different, why it's harder to get signatures. We can sit here in a vacuum and suppose that, with all due respect, suppose that this amount of signatures would be possible. But that's why in Green Party, the 2016 decision in January, a Green Party case sent the case back because they said, again, you said just like Your Honor said, well, in Jenna's this was enough. In that case, that was enough. We don't do that. One follow up question. Is 34 days enough to raise your money and recruit and get ready? Judge Thompson found many months are required because that was the evidence in the case. The state, by the way, Secretary of State in other cases, has put on evidence to rebut this kind of thing. They've put on evidence in the past. Well, a canvasser can get this many signatures in that many days. Not in this case, not in a special election. And the special election cases I cited, including one from the 11th Circuit, all make the case strongly for why special elections are different. Last thing I want to refer the court to are this line of cases in which this court has said when all of the issues are not resolved, we don't find it moot. And we certainly don't issue a vacator in the case. And that's the Camp case of 2000. I wrote Camp. I understand it. Naturalist Society case. Thank you, Mr. Schoen. We have your case. Portland v. City of St. Augustine. We allowed you to go more than 10 minutes over. Okay. I was just answering the questions, Judge. I'm sorry. I think the last point was beyond answering questions. But that's okay, Mr. Schoen. Thank you very much. Thank you, Your Honor. General Bradshaw. Thank you, Your Honor. I won't use my full four minutes, or I don't intend to. I do want to make just two points. The first goes to this issue about what Judge Thompson actually said in his opinion versus what the claim was. So Mr. Schoen is exactly right. The claim that he brought in this case was a very narrow challenge. We really don't know what Judge Thompson's declaratory judgment means. It does seem to be broader than the claim that Mr. Schoen brought. We would respectfully request. It's written broader. It's written broader. We would respectfully request, no matter how the court resolves this case, whether you rule for us or rule for him, if you could rule in a way that would clarify what it is the State of Alabama needs to do with respect to special elections, that would be very helpful for us just generally on that issue. The second thing I want to point out is that, you know, Mr. Schoen has made the point that it's harder to run in a special election than it is in a regularly scheduled election. We understand that. But that was harder for the Republicans and Democrats too, right? I mean, one of the states' interest in this case is drawing some distinction, some fairness between people who are trying to get on the ballot as an independent candidate and people who are trying to get on the ballot in other ways. And so the Republicans and the Democrats who were going to run in those primaries, they had to start immediately. They filed their campaign papers immediately. They started raising money immediately. They put their teams together immediately. Well, in fairness, they have a lot of infrastructure in place to do that. Well, not within the primary, right? They're operating in the primary. So they're trying to get on the ballot through the primary system instead of trying to get on the ballot through the petitioning system. And we need to have those to be comparable because we don't want candidates to just say, you know what, in a special election I could easily get on the ballot by getting, you know, 300 signatures. I don't need to try to get on the ballot through the primary system. And so we're trying to have fairness between these two different methods of getting on the ballot. What you mean by that, just to make sure I understand, is the independent is only working to get on the ballot for the general election, whereas the party candidates whose parties are already on the ballot has to organize first to win a primary, potentially a primary runoff, and then a general election. That's exactly right. And that's why the date when Mr. Schoen's client had to give us his petition was the same date that we had the primary, right? So this is all calibrated together so that there's fairness between these two different ways of trying to get on the ballot. I just want to make that point because those candidates, they had a difficult time because of a special election as well, but that's just inherent in a special election. And it's not a reason to say that independent candidates get sort of a benefit that doesn't go to the other candidates. Those are the only two points I have. Unless the Court has any further questions, we would just respectfully ask that you reverse. And that is your response. That is your answer to the argument of your opponent to the effect that special elections are so different because of the no startup time. That's exactly right. That's exactly right. Unless the Court has any further questions. Thank you. Thank you. We have your case. Thank you.